NOT FOR CITATION

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCUS L. HUDSON,<br><br>       Petitioner,<br><br>  vs.<br><br>A.A. LAMARQUE, Warden,<br><br>       Respondent. | No. C 03-01876 JF (PR)<br><br>ORDER DENYING PETITION FOR A WRIT OF HABEAS CORPUS; GRANTING MOTION TO DISMISS SECOND AMENDED PETITION<br><br>(Docket Nos. 48, 49 & 50) |

Petitioner, a state prisoner proceeding <u>pro se</u>, seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. Respondent has filed an answer addressing the merits of Petitioner's two claims in his first amended petition, and Petitioner has filed a traverse. Respondent has filed a motion to dismiss Petitioner's second amended petition as mixed and untimely. (Docket No. 48.) Petitioner has not filed opposition to the motion.

**BACKGROUND**

Petitioner was convicted by a jury in the San Francisco Superior Court of second degree robbery. On April 4, 2002, Petitioner was sentenced to fifteen years in state prison. Petitioner appealed his conviction. The state appellate court affirmed the

1  conviction on October 30, 2002, and the California Supreme Court denied review on
2  January 15, 2003. Petitioner also filed a state habeas petition which was denied by the
3  state high court on January 15, 2004. Petitioner filed the instant federal petition on April
4  25, 2003.

Petitioner's original petition contained the following claims: 1) ineffective
assistance of trial counsel; 2) ineffective assistance of appellate counsel; 3) error by the
trial court in denying Petitioner's <u>Marsden</u>[1] motions; 4) error by the trial court in
instructing the jury with CALJIC 17.41.1; 5) conspiracy between the prosecution and
witnesses for the witnesses to commit perjury; and 6) unconstitutional identification
procedure. This Court ordered Respondent to show cause why the petition should not be
granted. Respondent filed a motion to dismiss the petition for failure to exhaust state
remedies. Petitioner filed opposition and a motion to withdraw and stay his pending
habeas petition in order to exhaust his state remedies. The Court granted Respondent's
motion to dismiss, concluding that Petitioner had failed to exhaust his state remedies as to
claims 1, 2, 5 and 6. On March 9, 2005, the Court directed Petitioner to file an amended
petition containing only exhausted claims, *i.e.*, claims 3 and 4, and then to file a motion to
stay the amended petition so that he could to exhaust his unexhausted claims in state
court. (Docket No. 22.)

On April 5, 2005, Petitioner filed a first amended petition raising only the
exhausted claims, *i.e.*, improper denial of his <u>Marsden</u> motions and instructional error.[2]
Petitioner did not file a motion for a stay. The Court ordered Respondent to show cause
why the amended petition should not be granted. Respondent filed an answer on
November 15, 2007, addressing the merits of the claims.

On December 13, 2007, Petitioner filed a document entitled "Traverse" which
consisted in part of a reply to Respondent's arguments against his previously exhausted

---

[1] <u>People v. Marsden</u>, 2 Cal.3d 118 (1970).

[2] The amended petition was mistakenly opened as a new habeas action in case no. C 05-1486 JF (PR).

Order Denying Petition; Granting Motion to Dismiss
P:\PRO-SE\SJ.JF\HC.03\Hudson876_denyHC&grant-mtd.wpd      2

claims. In the same document, Petitioner purported to allege his previously *unexhausted* four claims, which he by then had exhausted. Petitioner also alleged for the first time that his rights under the Confrontation Clause were violated at his trial, relying upon Crawford v. Washington, 541 U.S. 36 (2004). The Court construed this pleading as a second amended petition, granted Petitioner's motion to file a second amended petition, and ordered Respondent to file a supplemental answer addressing the newly exhausted claims. In lieu of an answer, Respondent filed a motion to dismiss the second amended petition as mixed and untimely.

For the reasons discussed below, the petition will be denied on the merits with respect to the two claims presented in the first amended petition, and Respondent's motion to dismiss the second amended petition will be granted.

**DISCUSSION**

A.   Standard of Review

Because the instant petition was filed after April 24, 1996, it is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), which imposes significant restrictions on the scope of federal habeas corpus proceedings. Under AEDPA, a federal court cannot grant habeas relief with respect to a state court proceeding unless the state court's ruling was "contrary to, or an involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000). "Under the 'unreasonable application clause,' a federal habeas court may grant

1 the writ if the state court identifies the correct governing legal principle from [the]
2 Court's decisions but unreasonably applies that principle to the facts of the prisoner's
3 case." Id. "[A] federal habeas court may not issue the writ simply because the court
4 concludes in its independent judgment that the relevant state-court decision applied
5 clearly established federal law erroneously or incorrectly.  Rather, that application must
6 also be unreasonable." Id. at 411.

A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.  The "objectively unreasonable" standard does not equate to "clear error" because "[t]hese two standards . . . are not the same.  The gloss of clear error fails to give proper deference to state courts by conflating error (even clear error) with unreasonableness."  Lockyer v. Andrade, 538 U.S. 63, 75 (2003).

A federal habeas court may grant the writ it if concludes that the state court's adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding." 28 U.S.C. § 2254(d)(2).  The court must presume correct any determination of a factual issue made by a state court unless petitioner rebuts the presumption of correctness by clear and convincing evidence.  28 U.S.C. § 2254(e)(1).

B.   Legal Claims and Analysis

Petitioner raises the following two claims in his first amended petition: 1) the trial court erred in denying Petitioner's Marsden motions, violating his Sixth Amendment right to effective assistance of counsel; and 2) the trial court erred in instructing the jury with CALJIC 17.41.1, resulting in a violation of due process.

///
///
///
///

    1.   Marsden Motions

Petitioner contends that the denial of his two Marsden[3] motions violated his right to effective assistance of counsel. Chris Morales was the third attorney appointed to represent Petitioner in the course of his criminal case. Petitioner had filed a Marsden motion complaining about the representation provided by the attorney who represented him immediately prior to Morales, but the only Marsden rulings he challenges in the instant proceeding are the rulings on his two Marsden motions involving Morales.

The Sixth Amendment grants criminal defendants who can afford to retain counsel a qualified right to hire counsel of their choice. See Wheat v. United States, 486 U.S. 153, 159, 164 (1988). A criminal defendant who cannot afford to retain counsel has no right to counsel of his own choosing. See id. Nor is he entitled to an attorney who likes and feels comfortable with him. The Sixth Amendment guarantees effective assistance of counsel, not a "meaningful relationship" between an accused and his counsel. See Morris v. Slappy, 461 U.S. 1, 14 (1983). The essential aim is "to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." Wheat, 486 U.S. at 159.

Nonetheless, to compel a criminal defendant to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive the defendant of any counsel whatsoever. Daniels v. Woodford, 428 F.3d 1181, 1197 (9th Cir. 2005). "[N]ot every conflict or disagreement between the defendant and counsel implicates Sixth Amendment rights." Schell v. Witek, 218 F.3d 1017, 1027 (9th Cir. 2000) (en banc). The denial of a motion to substitute counsel implicates a defendant's Sixth Amendment right to counsel and is properly considered in federal habeas. See generally Schell, 218 F.3d at 1024-25. The "ultimate constitutional question" on federal habeas review is whether the state trial court's denial of the Marsden motion "actually violated [the defendant's] constitutional rights in that the conflict between [the defendant]

---

[3] People v. Marsden, 2 Cal. 3d 118 (1970), requires the California trial court to permit a criminal defendant requesting substitution of counsel to specify the reasons for his request and generally to hold a hearing.

1  and his attorney had become so great that it resulted in a total lack of communication or

2  other significant impediment that resulted in turn in an attorney-client relationship that

3  fell short of that required by the Sixth Amendment." Schell, 218 F.3d at 1026.

4        The California Court of Appeal summarized the particulars of Petitioner's

5  Marsden motions in its rejection of this claim on appeal:

> A.   ***Background***
> The record indicates that on May 3, 2001, three months before [Petitioner's] preliminary hearing, the trial court relieved assistant public defendant Rafael Trujillo as [Petitioner's] attorney and substituted David Simerly as counsel. The trial court denied [Petitioner's] Marsden motion to replace Simerly, but [Petitioner] nevertheless received new counsel, Chris Morales. [Petitioner] made two Marsden motions to discharge Morales. Both were denied.
>
> 1.   *February 14, 2002 Marsden Motion*
> [Petitioner's] February 14, 2002 Marsden motion to discharge Morales was heard before Judge Cynthia Ming-Mei. After the court asked [Petitioner] to detail the reasons for the motion, [Petitioner] stated that counsel was not providing "proper representation." [Petitioner] complained that he and Morales had a "conflict of interest from the beginning," that Morales did not accept collect calls or talk to him and that Morales refused to file motions that [Petitioner] suggested.
>
> When the court asked [Petitioner] to explain his complaints further, particularly the improper representation, [Petitioner] complaint that Morales "didn't have interest in the case" and had no trial strategy. When the court inquired about the motions [Petitioner] requested, [Petitioner] claimed that he wanted a "1385 in furtherance of justice for me being detained here," and a motion to dismiss based on the inability of a witness to identify him in the lineup. [Petitioner] claimed, "[Morales] hadn't said a thing with me. We hadn't discussed the case. Hasn't done nothing together. I don't really want to talk to him now because, you know, he had no interest in this. So I can't trust him. I don't even trust him as, you know, as being an attorney working it in my interests."
>
> The court, frustrated by [Petitioner's] interruptions during her attempts to address him, stated, [Y]ou know what one of the problems is? It is coming out, I think, clearly on the record. You want everybody to know what your position is, but you are not willing to listen to anybody else. I am trying to explain to you something and you keep talking over me. That suggests to me that part of the problem here is that you are not necessarily listening to what it is your lawyer has to say, because maybe you don't like either the message or advice that he is giving based upon his experience. You are cutting me off, and I am wondering if you do the same thing to Mr. Morales, which makes it difficult for him to convey whatever it is that he is trying to convey." Cautioning [Petitioner] not to interrupt, the court asked Morales to respond. Morales stated that he had visited [Petitioner] twice at jail, but on each occasion they "had very short talks, because he almost instantly gets angry and won't listen to pretty much anything I have to say. And both times he has got up and stormed out of the interview room after about 15 minutes. My investigator went to visit him, and the same thing happened. In reviewing the file that Mr. Simerly gave me, the same thing happened to him, and also Rafael Trujillo, who was on of [Petitioner's]

previous attorneys.  So... that is sort of his M.O. in dealing with his attorneys."

Morales told the court that his office accepts collect calls from clients during business hours.  Morales advised the court that although he disagreed with the determination of [Petitioner's] competency, he and his investigator were working diligently and were prepared to go to trial.  Morales advised that he was trying to obtain information on [Petitioner's] mental health status, but that [Petitioner] refused to sign a waiver for the release of his psychiatric records.

Morales told the court that he did not reject [Petitioner's] request for a motion to dismiss regarding the lineup.  Morales stated that although he advised [Petitioner] the motion was without legal basis, he would do additional research.  Morales acknowledged that the primary witness did not identify [Petitioner] at the lineup, but noted that this witness stood very close to [Petitioner] at the time of the incident and identified [Petitioner] at the preliminary hearing.

In response to an inquiry of the court, Morales recounted his 10-year legal experience, including the handling of numerous robbery cases involving identification issues.

The court denied the <u>Marsden</u> motion. The court advised [Petitioner] that the poor communication between him and counsel was likely based on [Petitioner's] inability to listen.  When [Petitioner] interrupted, the court stated: "And perhaps [counsel] was unable to complete his explanation.  As an indication that it is in this Court's opinion likely that that occurred, the remark that you just made, I am in the middle of explaining to you what I am doing and why I am doing it, and you have just interrupted me in the face our previous discussion not more than ten minutes ago about that particular style of expressing yourself, which seems to be getting in the way, perhaps, of your feeling like you are getting adequate explanation. ¶ If you storm out of the room, and if you get mad and start yelling and screaming, then you are not going to be able to get any of the information, because you are not going to be listening."  The court found that Morales was providing adequate representation and that the attorney-client relationship had not "broken down to such a degree to jeopardize the effective assistance of counsel."

    2. <u>March 25, 2002 Marsden Motion</u>

On the first day of trial on March 25, 2002, before Judge Claude Perasso, Morales advised the court that [Petitioner] did not want to go to trial, but also did not want to accept the prosecution's plea offer.  [Petitioner] stated, "I didn't say I didn't want to go to trial.  I said I didn't want you for my attorney in trial."  As [Petitioner] proceeding to complain about Morales, the court tried several times to stop him in order to clear the courtroom.  However, [Petitioner] continued speaking while the prosecutor was still present.  When the court noted that [Petitioner] had made earlier <u>Marsden</u> motions, [Petitioner] replied, "There still is.  I've been complaining about this attorney.  And I still have problems with him. You know, he's not doing his job.  And I refused him.  I'm not going to go to trial with him.  I mean, you can try to force it if you want to, but I ain't going to participate."

The following colloquy then ensued between the court, [Petitioner] and Morales, while the prosecutor was still present:

"THE COURT: Okay.  At any rate, the motion, as you have phrased it, a <u>Marsden</u> motion, based on what you've said here this morning is denied. ¶ Okay.  That tells me that you're going to go to trial or you're going to plead.

      "THE [PETITIONER]: No, I'm not going to plead guilty, and I'm not going to trial. I just told you, man. I'm having problems with - he refused to defend me, man. He ain't been up to talk to me or nothing. You can't force me to go to trial. The attorney ain't doing nothing That's like straight railroading. What you going to try railroad me to fifteen? He already told me he wasn't going to – I wasn't going to take the eight years, he going to make sure I go to the pen. I mean, I'm not going for that."
      "THE COURT: At any rate, Mr. Morales, did you tell him if he didn't take the eight years, you would make sure that he would go to the pen?
      "THE [PETITIONER]: Yes, he did.
      "MORALES: No, no, I didn't.
      "THE COURT: I would doubt that.
      "THE [PETITIONER]: Well, I mean, yes, you say that. I know what he said.
      "THE COURT: Okay. At any rate, it's a question of credibility, and I prefer to –
      "THE [PETITIONER]: Whatever, man.
      "THE COURT: – believe Mr. Morales."

People v. Hudson, No. A098340, slip op. 1, 3-6 (Cal.Ct.App. Oct. 30, 2002) (Resp't Ex. H).

      The California Court of Appeal rejected Petitioner's claim that the trial court had erred in denying his motions for substitute appointed counsel. With respect to the first Marsden motion on February 14, 2002, the appellate court determined that "the court properly concluded that [Petitioner's] claims of inadequate representation were groundless." (Resp't Ex. H at 7.) The appellate court noted that the trial court took into consideration Morales' experience as a trial attorney in rejecting Petitioner's claim that Morales had no interest in the case, "obviously [having] found Morales' description of his trial efforts more credible than [Petitioner's] assessment." (Id.) The appellate court also determined that "a disagreement over trial tactics, without more, does not mandate appointment of new counsel." (Id. (citation omitted).) Finally, the appellate court rejected Petitioner's conflict of interest claim because "the court reasonably concluded that [Petitioner's] complaints stemmed from his unwillingness to listen to counsel" and "a defendant may not force the substitution of counsel by his own conduct that manufactures a conflict." (Id. (citation omitted).)

      Regarding the second Marsden motion on March 25, 2002, the state appellate court concluded that although the record was sparse, it nonetheless was "sufficient to show that

[Petitioner] stated his reasons for wanting to discharge Morales, and that the court weighed those reasons and found them unpersuasive." (Id.) Petitioner's complaints against Morales were that Morales "refused to defend him," that Morales had not been talking to him, and that Morales was trying to "railroad" him into going to prison. (See *supra* at 8.) Morales denied these accusations. (Id.) The state appellate court determined that the trial court "was entitled to find Morales more credible." (Resp't Ex. H at 8; (citation omitted).) It also rejected Petitioner's claim on appeal that he believed Morales "was a liar" and that they could not work together effectively. (Id.) The court stated that "Petitioner's inability to trust or listen to his counsel does not require substitution of counsel" because "if a [petitioner's] claimed lack of trust in, or inability to get along with, an appointed attorney were sufficient to compel appointment of substitute counsel, [petitioners] effectively would have a veto power over any appointment and by a process of elimination could obtain appointment of their preferred attorneys, which is certainly not the law." (Id. (citation omitted).) The state appellate court concluded that there was no abuse of discretion by either trial judge in denying Petitioner's Marsden motions. (Id.)

   This Court reaches the same conclusion. The record reflects that communication between appointed counsel and Petitioner was difficult throughout the trial proceedings, and that Petitioner repeatedly refused to listen to his attorney's advice or give him an opportunity to explain his tactical decisions. Morales stated to the trial judge during the first Marsden hearing that his interviews with Petitioner were comprised of "very short talks, because [Petitioner] almost instantly gets angry and won't listen to pretty much anything I have to say[,] [a]nd both times he has got up and stormed out of the interview room after about 15 minutes." (See *supra* at 6.) Morales also stated that, "My investigator went to visit him, and the same thing happened. In reviewing the file that Mr. Simerly gave me, the same thing happened to him, and also Rafael Trujillo, who was one of [Petitioner's] previous attorneys. So... that is sort of his M.O. in dealing with his attorneys." (Id. at 6-7.) Petitioner's unwillingness to listen to Morales and accept his tactical determinations was not a legitimate reason to compel appointment of a new

counsel, see Schell v. Witek, 218 F.3d at 1026 & n.8, especially when there was no reason to expect that the same problem would not arise again with new counsel.

The state court's determinations that counsel was performing adequately and that no irreconcilable conflict existed were not unreasonable. In light of the evidence presented at the Marsden hearings, it was not unreasonable for the trial court to think that Petitioner's distrust of any appointed counsel's exercise of his professional judgment and unwillingness to listen to counsel's advice would continue with new counsel, and that little would be gained by appointing a fourth attorney to represent Petitioner. Petitioner had a habit of constantly interrupting and talking over those who were addressing him, including the trial court. (See *supra* at 7.) Appointment of new counsel would not end the anger and impatience that was more of a product of Petitioner's own mindset than of counsel's behavior.

Bearing in mind that the "purpose of providing assistance of counsel 'is simply to ensure that criminal defendants receive a fair trial,'" Wheat, 486 U.S. at 159, this court sees no evidence that purpose went unfulfilled in this case or that a Sixth Amendment violation occurred. Petitioner has not shown that there was an impediment that resulted in an attorney-client relationship that fell short of that required by the Sixth Amendment. Accordingly, the state court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent, or involved an objectively unreasonable determination of the facts. See 28 U.S.C. § 2254(d).

2.   CALJIC 17.41.1

Petitioner's second claim is that the trial court erred in instructing the jury with CALJIC 17.41.1.[4] Petitioner claims that this instruction "violated [Petitioner's] and jurors' constitutional rights by misinforming the jury right power to nullify mandating [sic]." (First Amended Pet. at 5.)

The state appellate court rejected this claim under the California Supreme Court's

---

[4] CALJIC 17.41.1 instructs jurors to inform the court of other jurors' misconduct. (See Resp't Ex. A at 128.)

recent decision in People v. Engelman, 28 Cal.4th 436, 439-440 (2002), which held that "although the instructions should not be given in the future, it does not infringe upon a defendant's constitutional rights to trial by jury or a unanimous verdict." (Resp't Ex. H at 8.) "Here, the jury deliberated one hour before reaching its verdict. There is nothing in the record indicating that the jury was improperly influenced by the challenged instruction." (Id.)

Under controlling Ninth Circuit authority, CALJIC 17.41.1 is not contrary to any existing Supreme Court precedent. See Brewer v. Hall, 378 F.3d 952, 955-56 (9th Cir. 2004) (rejecting under AEDPA habeas claims against CALJIC 17.41.1). Accordingly, the state court's rejection of this claim was neither contrary to, nor an unreasonable application of, clearly established Supreme Court precedent, or involved an objectively unreasonable determination of the facts. See 28 U.S.C. § 2254(d).

C.  Respondent's Motion to Dismiss Second Amended Petition

Respondent moves to dismiss the second amended petition as containing an unexhausted claim and as untimely. Respondent contends that the second amended petition is a "mixed" petition because it asserts an unexhausted Crawford claim that Petitioner did not present to the state courts on direct appeal or on state collateral review. Respondent also argues that the Crawford claim, as well as Petitioner's more recently exhausted claims of ineffective assistance of trial and appellate counsel, conspiracy and unconstitutional identification, are time barred.

   1.  Exhaustion of *Crawford* Claim

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. See 28 U.S.C. § 2254(b),(c); Rose v. Lundy, 455 U.S. 509, 515-16 (1982); Duckworth v. Serrano, 454 U.S. 1, 3 (1981); McNeeley v. Arave, 842 F.2d 230, 231 (9th Cir. 1988). Neither Petitioner's

direct appeal nor any of the state habeas petitions contain the Crawford claim. (Resp't Exs. H and K.) Petitioner has not presented any evidence to show that he otherwise exhausted the Crawford issue in state court. Accordingly, this claim is subject to dismissal. See Rose v. Lundy, 455 U.S. at 515-16.

        2.        Statute of Limitations

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which became law on April 24, 1996, imposed for the first time a statute of limitations on petitions for a writ of habeas corpus filed by state prisoners. Petitions filed by prisoners challenging non-capital state convictions or sentences must be filed within one year of the latest of the date on which: (A) the judgment became final after the conclusion of direct review or the time passed for seeking direct review; (B) an impediment to filing an application created by unconstitutional state action was removed, if such action prevented petitioner from filing; (C) the constitutional right asserted was recognized by the Supreme Court, if the right was newly recognized by the Supreme Court and made retroactive to cases on collateral review; or (D) the factual predicate of the claim could have been discovered through the exercise of due diligence. 28 U.S.C. § 2244(d)(1). The one-year period generally will run from "the date on which the judgment became final by conclusion of direct review or the expiration of the time for seeking such review." 28 U.S.C. § 2244(d)(1)(A). Accordingly, if a petitioner fails to seek a writ of certiorari from the United States Supreme Court, the AEDPA's one-year limitations period begins to run on the date the ninety-day period defined by Supreme Court Rule 13 expires. See Miranda v. Castro, 292 F.3d 1063, 1065 (9th Cir. 2002) (where petitioner did not file petition for certiorari, his conviction became final ninety days after the California Supreme Court denied review); Bowen, 188 F.3d at 1159 (same). Here, Petitioner did not seek a writ of certiorari from the Supreme Court, and therefore, the one-year limitations period began to run on April 15, 2003, which is ninety days after the California Supreme Court denied his state petition for review on January 15, 2003. Absent tolling, Petitioner had until April 15, 2004, to file a timely petition.

The time during which a properly filed application for state post-conviction or other collateral review is pending is excluded from the one-year time limit. Id. § 2244(d)(2). A state habeas petition filed after AEDPA's statute of limitations ended cannot toll the limitation period. See Ferguson v. Palmateer, 321 F.3d 820, 823 (9th Cir. 2003) ("[S]ection 2244(d) does not permit the reinitiation of the limitations period that has ended before the state petition was filed," even if the state petition was timely filed) (holding that Oregon's two-year limitation period for the filing of state habeas petitions does not alter the operation of the AEDPA, even though prisoners who take full advantage of the two-year period will forfeit their right to federal habeas review); Jiminez, 276 F.3d at 482 (same). Section 2244(d)(2) cannot "revive" the limitation period once it has run (i.e., restart the clock to zero); it can only serve to pause a clock that has not yet fully run. "Once the limitations period is expired, collateral petitions can no longer serve to avoid the statute of limitations." Rashid v. Kuhlmann, 991 F. Supp. 254, 259 (S.D.N.Y. 1998).

On December 19, 2003, Petitioner filed a state habeas petition in the California Court of Appeal, which denied the petition. The state high court denied review on January 15, 2004. Petitioner is therefore entitled to twenty-eight days of tolling during this period, making May 13, 2004 the expiration date for the limitations period. Petitioner returned to state court to exhaust the claims of ineffective assistance of trial and appellate counsel, conspiracy and unconstitutional identification between June 28, 2004 to May 18, 2005.[5] However, Petitioner is not entitled to tolling during this period because the statute of limitations already had expired on May 13, 2004. See Ferguson, 321 F.3d at 823; Rashid v. Kuhlmann, 991 F. Supp. at 259. Nor is Petitioner entitled to equitable tolling. He has set forth no basis to justify that this "extraordinary exclusion" should apply to him. Miranda v. Castro, 292 F.3d 1063, 1065 (9th Cir. 2002) (petitioner bears burden of showing that equitable tolling should apply to him).

---

[5] The Court advised Petitioner to file a motion to stay his petition while he exhausted these claims due to potential statute of limitation problems, but Petitioner failed to do so.

1    Petitioner did not file his second amended petition until December 13, 2007, forty-
2 two months after the expiration of the statute of limitations on May 13, 2004.  The newly
3 exhausted claims are therefore untimely and barred by the statute of limitations.
4 Accordingly, these claims must be DISMISSED as untimely.  Respondent's motion to
5 dismiss the second amended petition is GRANTED.  (Docket No. 48.)

## CONCLUSION

The Court concludes that Petitioner has failed to show any violation of his federal constitutional rights in the underlying state criminal proceedings.  Accordingly, the petition for writ of habeas corpus is DENIED.  Respondent's motion to dismiss the second amended petition is GRANTED.  (Docket No. 48.)

The clerk shall terminate any pending motions as moot, enter judgment and close the file.

This order terminates Docket Nos. 48, 49 and 50.

IT IS SO ORDERED.

DATED: 9/2/08

JEREMY FOGEL
United States District Judge